UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ESTATE of AFONSO BRANDAO, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * Civil Action No. 24-cv-10147-ADB |
| | * |
| DANIEL BENVIE, ANTHONY LOUIS, | * |
| OLEGARIO DA GRACA, BRENDA I. | * |
| PEREZ, Chief of Police of the Brockton | * |
| Police Department in her Official Capacity, | * |
| and THE CITY OF BROCKTON | * |
| | * |
| Defendants. | * |

# MEMORANDUM AND ORDER

BURROUGHS, D.J.

The Estate of Afonso Brandao ("Brandao" or "Plaintiff") brings this action against Daniel Benvie ("Officer Benvie" or "Benvie"), Olegario Da Graca ("Officer Da Graca" or "Da Graca"), the City of Brockton ("the City"), Brenda I. Perez, Chief of Police of the Brockton Police Department in her Official Capacity ("Perez"), and Anthony Louis ("Officer Louis" or "Louis," and collectively "Defendants"), related to Brandao's death while he was in custody following his arrest on November 13, 2020. [ECF No. 12 ("Complaint" or "Compl.")]. Presently before the Court is Defendants' motion to dismiss Counts I and III of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), [ECF No. 10], as well as Brandao's motion to substitute, [ECF No. 17]. For the reasons set forth below, the motion to substitute, [ECF No. 17], is GRANTED, and the motion to dismiss, [ECF No. 10], is GRANTED IN PART and DENIED IN PART.

I.      BACKGROUND

      A.      Factual Background

The following facts are taken from the Complaint, the factual allegations of which are assumed to be true when considering a motion to dismiss.  Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

On November 13, 2020, at approximately 10:34 PM, Officer Benvie arrested Brandao near Ellsworth Avenue in the City of Brockton, Massachusetts.  [Compl. ¶¶ 12–13].  At the time of his arrest, Brandao "appeared to be under the influence of an intoxicating substance."  [Id. ¶ 14].  Officer Benvie searched Brandao at the scene of his arrest but did not find any drugs or other illicit substances during the search.  [Id. ¶¶ 15–16].

Brandao was transported to the Brockton Police Department, where at approximately 11:20 PM, Officer Da Graca "booked and charged [Brandao] with operating a motor vehicle without a license, disorderly conduct, and disturbing the peace."  [Compl. ¶¶ 17–19].  As part of the booking process, Officer Da Graca searched Brandao and he did not find "any drugs or illicit substances."  [Id. ¶¶ 20–21].  Officer Da Graca noted that Brandao reported using drugs and alcohol on the "Police Department's Suicide Evaluation Form, which is a standard booking document," and that "Brandao appeared to be under the influence of an intoxicating substance."  [Id. ¶¶ 22–23].  In addition, Brockton Detective Nazaire Paul noticed during the booking process that Brandao appeared to be under the influence of an intoxicating substance.  [Id. ¶ 25].  After he was booked, Paul and another Brockton Detective placed Brandao in Cell Number 20.  [Id. ¶ 26].

"The Brockton Police Department has a policy requiring officers to perform prisoner well-being checks every fifteen (15) minutes," [Compl. ¶ 27], and Officer Da Graca completed

well-being checks at 11:45 PM and 12:00 AM, [id. ¶ 28]. Although Brandao had been loud when he was first placed in the cell, Officer Da Graca noted that he eventually fell asleep. [Id. ¶ 29]. At midnight, Officer Louis relieved Officer Da Graca as the booking officer on duty and started a shift that ran until 8:00 AM. [Id. ¶ 30]. Officer Da Graca informed Officer Louis "of the number of individuals in the holding cells and their bail status." [Id. ¶ 31].

From midnight until his break at 3:00 AM, Officer Louis "made several entries into the Department's prisoner well-being check log book," and "verified [that] he performed the required checks" by writing his police ID and name next to each entry. [Compl. ¶¶ 32–34]. At 3:00 AM, Officer DaRosa relieved Officer Louis for his scheduled break. [Id. ¶ 35].

Officer Da Rosa made the required well-being checks every fifteen minutes during Officer Louis' break. [Compl. ¶ 36]. During his first check of Brandao's cell, "Officer DaRosa observed [] Brandao laying on his right side with his feet on the floor and a dollar bill in his right hand." [Id. ¶ 37]. After seeing Brandao in the same position "on two (2) subsequent well-being checks," Officer DaRosa asked another officer to open the cell door so he could check on him. [Id. ¶ 38]. "Brandao was cold and did not have a pulse." [Id. ¶ 39].

Emergency medical personnel were summoned and they pronounced Brandao dead, allegedly as a result of overdosing on opioids while in custody. [Compl. ¶¶ 40–42]. Thereafter, three bags of cocaine and one bag of fentanyl were found "among and on [] Brandao's person in the cell." [Id. ¶ 43]. He had been dead for approximately two to three hours when the paramedics examined him. [Id. ¶ 59].

According to the Complaint, the Massachusetts State Police review of the booking room security footage shows Officer Louis leaving the booking desk and walking toward the cells at 12:11 AM, presumably to do a prisoner well-being check, and returning around 12:33 AM.

[Compl. ¶¶ 60–61]. The Complaint states that Officer Louis did not perform prisoner well-being checks from 12:33 AM until he left the desk for his break at 3:00 AM. [Id. ¶ 62]. Brandao allegedly died of an opioid overdose during this time. See [id. ¶¶ 41–42, 59, 62].

The Massachusetts State Police interviewed Officer Louis twice on the morning of November 14, 2020, regarding Brandao's death. [Compl. ¶¶ 44–45]. In these interviews, Officer Louis said that he had been informed that Brandao "was under the influence of a substance," [id. ¶ 47], "he did not observe any drugs in Brandao's cell or on the floor," [id. ¶ 51], he checked on Brandao every fifteen minutes per the Brockton Police Department policy, [id. ¶ 46], Brandao appeared to be sleeping in the same position at each prisoner well-being check, [id. ¶¶ 48–49], and that he was breathing each time Officer Louis performed a required well-being check, [id. ¶ 50]. Thereafter, Officer Louis "filed a 'Supplemental Narrative' report" regarding Brandao's death, in which he stated that he noticed at midnight that Brandao "was in a 'nontraditional sleeping position,'" and that "Brandao remained in the same position during each of his subsequent well-being checks" which he did every fifteen minutes until his 3:00 AM break. [Id. ¶¶ 52–55].[1]

### B. Procedural History

Plaintiff filed the Complaint in the Brockton Superior Court on November 6, 2023, asserting claims under 42 U.S.C. § 1983 for wrongful death while in police custody in violation of the Eighth and Fourteenth Amendments against Officers Benvie and Da Graca (Count I) and

---

[1] Officer Louis was indicted by a Grand Jury in Plymouth County in 2021 "on two [] counts of filing a false written report by a public employee and two [] counts of willfully misleading a police officer with intent to interfere with a criminal investigation." [Compl. ¶ 63]. He "pleaded guilty to the two [] counts of filing a false written report by a public employee and admitted to sufficient facts to the two [] counts of willfully misleading a police officer with intent to interfere with a criminal investigation," and was sentenced to three years of probation. [Id. ¶¶ 64–65].

Officer Louis (Count II); as well as a 42 U.S.C. § 1983 claim for wrongful death as a result of a failure to adequately train police in the face of the opioid epidemic against the City of Brockton and Defendant Perez in her official capacity as Chief of Police (Count III). See [Compl. ¶¶ 66–112]. Defendants removed the case to this Court on January 19, 2024. See generally [id.].

Defendants Benvie, Da Graca, Perez, and the City of Brockton moved to dismiss Counts I and III on January 24, 2024. [ECF No. 10]. Plaintiff opposed on February 16, 2024. [ECF No. 15].

Separately, Plaintiff filed a motion to substitute party on April 2, 2024, requesting a substitution of "Andreia D. Brandao, as Personal Representative of the Estate of Alfonso Brandao a.k.a. Afonso Brandao" for the Estate of Afonso Brandao. [ECF No. 17]. Defendants opposed on April 4, 2024. [ECF No. 18].

## II.     MOTION TO SUBSTITUTE

In their motion to dismiss, Defendants argue that the Estate of Afonso Brandao is not a proper party. [ECF No. 11 at 5–6]. After the motion was filed, Andreia D. Brandao, Brandao's sister, moved to substitute herself as the personal representative of Brandao's estate. [ECF No. 17].

Brandao died on November 14, 2020. [Compl. ¶ 2]. Plaintiff filed the Complaint in the Superior Court on November 6, 2023. See [id. at 1].

About a month later, on December 1, 2023, Andreia Brandao applied to be the personal representative of Brandao's estate. [ECF No. 17-1 at 1–2]. On March 20, 2024, the Plymouth County Probate and Family Court approved the request insofar as Andreia D. Brandao was appointed as the late and limited personal representative of Alfonso Brandao, a/k/a Afonso

5

Brandao, under the "late and limited exception" of the Massachusetts Uniform Probate Code. See [ECF No. 17-1 at 4]; see also Mass. Gen. Laws ch. 190B, § 3-108.

> Mass. Gen. Laws ch. 190B, § 3-108 provides that
>
> [n]o informal probate or appointment proceeding or formal testacy or appointment proceeding . . . may be commenced more than 3 years after the decedent's death, except that . . . (4) an informal appointment or a formal testacy or appointment proceeding may be commenced thereafter if no proceedings relative to the succession or estate administration has occurred within the 3 year period after the decedent's death, but the personal representative shall have no right to possess estate assets . . . beyond that necessary to confirm title thereto in the successors to the estate and claims other than expenses of administration shall not be presented against the estate.

Mass. Gen. Laws ch. 190B, § 3-108. Thus, based on the language in § 3-108, "[a] late and limited personal representative's 'authority is limited by statute to confirming title to estate assets in the successors and paying expenses of administration, if any,'" [ECF No. 11 at 5 (quoting Bennett v. R.J. Reynolds Tobacco Co., No. 17-cv-0603, 2018 WL 662386, at *2 (Mass. Super. Jan. 8, 2018))], Defendants argue that Andreia Brandao, as a late and limited personal representative of her brother's estate, "can neither assert estate claims nor have estate claims asserted against [her]. Accordingly, the plaintiff . . . does not have standing to assert . . . claims that may have belonged to [decedent] before his death." [Id. (quoting Bennett, 2018 WL 662386, at *2)].

In response, Plaintiff argues that the Massachusetts Superior Court has considered and rejected the holding in Bennett twice "with respect to the powers of 'late and limited' personal representatives" in the wrongful death context. [ECF No. 15 at 6–7 (first citing Tebelekian v. Brincheiro, No. 1881-cv-02245 (Mass. Super. June 10, 2021); and then citing Anderson v. Lebrun, 2079-cv-00653, 2021 WL 4048602 (Mass. Super. July 1, 2021))]. Specifically, Plaintiff avers that late and limited personal representatives have standing to pursue wrongful death claims because

6

> [d]amages stemming from a[n] alleged wrongful death are not an asset of the estate . . . "Because a wrongful death claim is not an asset of the estate, a wrongful death action does not result in a claim by the estate and the damages from a wrongful death claim are not received by the personal representative or paid to the estate." . . . Consequently, the Justices in Tebelekian and Anderson each ruled a 'late and limited' representative could pursue claims stemming from the decedent's death.

[Id. at 7–8 (internal citations omitted) (first citing Marco v. Green, 615 N.E.2d 928, 932 (1993); and then quoting Anderson, 2021 WL 4048602 at *4)].

The Court agrees with Plaintiff.  In Tebelekian, for example, the plaintiff, a late and limited personal representative of her brother's estate, was found to have standing to bring a wrongful death action against a physician. [ECF No. 15-3 at 1–2].  Defendants in Tebelekian argued that the plaintiff did not have standing because she was appointed under the late and limited exception and thus "lack[ed] full powers of a personal representative," including the right to bring a wrongful death claim.  [Id. at 3].  The court rejected that argument and held that "[n]othing in the Massachusetts Probate Code purports to address wrongful death claims[,]" and that a wrongful death claim is not "'the decedent's property' . . . for purposes of the limitation upon a late and limited representative's authority[.]"  [Id. at 4–5].  The Court finds no basis to reach a different result here.

Accordingly, the Court GRANTS the motion to substitute, [ECF No. 17], and finds that Andreia D. Brandao, as Personal Representative of the Estate of Alfonso Brandao a.k.a. Afonso Brandao, is a proper party to bring this suit.

### III.     MOTION TO DISMISS

#### A.     LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d

7

74, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Id. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)). "The plausibility standard invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45). First, "the [C]ourt must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Second, "the [C]ourt must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

B.     DISCUSSION

1.     **Fourteenth Amendment (Count I)**[2]

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . .  The affirmative duty to protect arises . . . from the limitation which it has imposed on his freedom to act on his own behalf." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199–200 (1989) (first citing Estelle v. Gamble, 429 U.S. 97, 103–04 (1976); and then citing Youngberg v. Romeo, 457 U.S. 307, 315–16 (1982)).

"Not every injury suffered by a prisoner at the hands of another results in constitutional liability on the part of prison officials." Burrell v. Hampshire Cnty., 307 F.3d 1, 7–8 (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

> In Farmer, the [Supreme] Court established that only "deliberate indifference" by prison officials to an inmate's health or safety was sufficient to establish liability. The Farmer test for Eighth Amendment violations initially establishes two tests. First, the deprivation alleged must be, objectively, sufficiently serious. For a claim based on failure to prevent harm, the plaintiff must demonstrate he was incarcerated under conditions imposing a substantial risk of serious harm. Second, the plaintiff must show that prison officials possessed a sufficiently culpable state of mind, namely one of "deliberate indifference" to an inmate's health or safety. That state of mind is more blameworthy than negligence.

Id. at 8 (citing Farmer, 511 U.S. at 835) (internal citations omitted).  Regarding the deliberate indifference standard, the plaintiff must show that the defendants "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which

---

[2] In a § 1983 claim, "the challenged conduct must be attributable to a person acting under color of state law . . . ; second, the conduct must have" violated a constitutional right. [ECF No. 15 at 9 (citing Soto v. Flores, 103 F. 3d 1056, 1061 (1st Cir. 1997))].  The parties do not dispute that the alleged conduct is state action, so the Court only addresses whether there was a constitutional violation.

the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

In Cox v. Boston Police Department, the decedent was arrested and told officers "that he had taken opioids thirty minutes earlier and had been recently discharged from a detoxification treatment center." No. 22-cv-11009, 2022 WL 17486595, at *1 (D. Mass. Dec. 7, 2022). The arresting officers noted that he "appeared to have tendencies of someone who used drugs." Id. (internal quotation marks omitted). Prior to and during his booking, the officers reported that the decedent "struggled to stand upright," "sway[ed] side-to-side," was found sitting "slumped in a contorted position," had to be steadied by the officers "placing their hands on his back or holding his arm," and had to be tapped to stay awake. Id. In addition, the complaint "describe[d] and provide[d] examples from surveillance video footage of [the decedent's] plight to stand upright – notably his inability to stay awake." Id. at *2. The court found that this behavior was "more than sufficient to alert the officers, whether by a subjective or objective standard, to his urgent need for medical attention," and thus denied the defendants' motion to dismiss. Id. at *4.

Similarly, in Geigel v. Boston Police Department, officers arrested the decedent "in an area of the city recognized as 'the epicenter of the opioid epidemic.'" No. 22-cv-11437, 2024 WL 68387, at *1 (D. Mass. Jan. 5, 2024). One of the arresting officers was aware that the decedent "had a history of opioid use." Id. In that case, with respect to the officer who arrested the decedent, the court found that the officer "became aware that [the decedent] was at a serious risk of harm before his death and was deliberately indifferent to that risk. As [a result of the indifference], in the absence of medical treatment and monitoring," the decedent died. Id. at *5. Accordingly, the court denied a motion to dismiss a claim under the Fourteenth Amendment and § 1983. Id. at *7.

10

In this case, Defendants argue that "[e]ven if [Brandao] was under the influence of some substance," it does not follow that "objectively, a lay person would have easily recognized the need for medical intervention." [ECF No. 11 at 7]. Further, they aver that "[t]he only facts alleged against Officer[s] Benvie [and Da Graca] are that . . . [they each] conducted a search of [Brandao], and did not recover any illicit substances." [Id.]. Defendants contend that "[t]his falls flagrantly short of showing egregious, outrageous, [or] shocking behavior," and that the searches performed by Officers Benvie and Da Graca were "reasonable response[s] to the perceived risk at th[e] time." [Id.].

In response, Plaintiff argues that "the officers fail[ed] to obtain medical treatment and to perform reasonable monitoring despite the clear indications that Brandao was at risk of an overdose death given the manifestation of his intoxicated state on scene and at the station." [ECF No. 15 at 13].

Although this case is different from Cox and Geigel in that it lacks allegations of a known history of opioid use, see Cox, 2022 WL 17486595 at *1; Geigel, 2024 WL 68387 at *1, it is similar in that Benvie and Da Graca knew that Plaintiff appeared under the influence and reported using drugs and alcohol, but nevertheless failed to properly search him or provide him with care, and he later died from an overdose in custody. See [Compl. ¶¶ 13–14 (Brandao "was under the influence of an intoxicating substance" when he was arrested); id. ¶¶ 19–25 (Brandao appeared to be under the influence when he was booked, he reported using alcohol and drugs, and a search did not uncover drugs); id. ¶¶ 73–74 (Plaintiff alleging that the failure to search directly and proximately led to Brandao's death)]. Like the plaintiffs in Cox and Geigel, Plaintiff has sufficiently alleged, albeit thinly, that Benvie and Da Graca's actions or inactions were objectively "sufficiently serious" to state a claim for a violation of Brandao's right to be

free from a significant risk of harm while in custody, see Perry v. Roy, 782 F.3d 73, 78–79 (1st Cir. 2015), and that they had a "wanton disregard" for his needs, see id. at 79.

### 2. Qualified Immunity

Defendants next argue that even if Benvie and Da Graca violated the Fourteenth Amendment, they are protected by qualified immunity. [ECF No. 11 at 8–9].

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Courts should follow a two-part inquiry in order to determine whether a defendant is entitled to qualified immunity." Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011) (citing Pearson, 555 U.S. at 232). They should "first ask 'whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right.'" Id. (alteration in original) (quoting, Pearson, 555 U.S. at 232). Second, they should "ask 'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'" Id. (quoting Pearson, 555 U.S. at 232)).

The question of whether a right was clearly established is also a two-part inquiry. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). "The second-subpart asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." Id. (citing Wilson v. City of Boston, 421 F.3d 45, 57–58 (1st Cir. 2005)).

"The Supreme Court has emphasized 'the importance of resolving immunity questions at the earliest possible stage in litigation.'  To this end, the defense sometimes can be raised and evaluated on a motion to dismiss."  Haley, 657 F.3d at 47 (internal citation omitted) (first quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991); and then citing Siegert v. Gilley, 500 U.S. 226, 232–33 (1991)).  That said, "[i]t is not always possible to determine before any discovery has occurred whether a defendant is entitled to qualified immunity, and courts often evaluate qualified immunity at the summary judgment stage."  Giragosian v. Bettencourt, 614 F.3d 25, 29 (1st Cir. 2010).

As explained above, Plaintiff has sufficiently alleged a constitutional violation.  See supra.  Moreover, it has long been settled that an individual in custody has an established right to "his safety and general well-being," and that officers have an "affirmative duty to protect" the same.  DeShaney, 489 U.S. at 199–200.  As to whether "an objectively reasonable official" in officers Benvie and Da Graca's "position would have known that his conduct violated that rule of law," Alfano, 847 F.3d at 75, the Court finds that this inquiry requires a more robust factual record, see Giragosian, 614 F.3d at 29.  Accordingly, the Court finds that, at this stage of the litigation, qualified immunity does not shield Officers Benvie and Da Graca from suit.  Thus, the motion to dismiss Count I is DENIED.

### 3.     Municipal Liability (Count III)

Defendants next argue that Count III should be dismissed because Plaintiff has failed to state a claim of municipal liability under Monell v. Dep't of Social Servs., 436 U.S. 658 (1978).

13

[ECF No. 11 at 9–11].³  To succeed on a Monell claim, Plaintiff must sufficiently allege that (1) "[t]he alleged municipal action at issue . . . constitute[s] a 'policy or custom' attributable to the City," (2) "the municipal policy or custom actually have caused the plaintiff's injury," and (3) "the municipality possessed the requisite level of fault."  Young v. City of Providence, 404 F. 3d 4, 25–26 (1st Cir. 2005).  "The Supreme Court . . . has set a very high bar for assessing municipal liability under Monell."  Id. at 26.

As for a failure to train claim, "[t]riggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies."  Haley, 657 F. 3d at 52 (first citing Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 407 (1997); and then citing City of Canton v. Harris, 489 U.S. 378, 387, 390 n.10 (1989)).  "A plaintiff typically must show a 'pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train.'"  Gray v. Cummings, 917 F. 3d 1, 14 (1st Cir. 2019) (alteration in original) (quoting Connick v. Thompson, 563 U.S. 51, 62 (2011)).

Defendants argue first, as above, that the Plaintiff has not alleged sufficient facts against Officers Benvie or Da Graca to establish an underlying constitutional violation.  [ECF No. 11 at 6–8].  Second, Defendants aver that the city had "a policy in place for officers to perform well-being checks every fifteen minutes," and "[t]he fact that Louis failed to follow a clearly established policy" does not mean the city can be held liable under Monell.  [Id. at 11].

---

³ "Under both Massachusetts and federal law, a suit against a municipal police department or its chief (in his or her official capacity) is deemed to be a suit against the municipality itself."  Therefore, naming the Chief of Police is superfluous and should be regarded as such.  Murphy v. Town of Natick, 516 F. Supp 2d 153, 158 (D. Mass. 2007).

Defendants also contend that Plaintiff "points to no pattern of constitutional violations which would allow for the inference that the City" knew of an "obvious risk to the constitutional rights of its citizens; was on notice of a deficiency in its training program; and disregarded [that risk] by failing to respond." [Id. (citing Geigel, 2024 WL 68387, at *2–3)].

Plaintiff responds that in the "context of the 'opioid addiction epidemic,'" the City of Brockton did not "provide[] its police officers with reasonable and adequate training and supervision with respect to the opioid epidemic crisis." [ECF No. 15 at 15]. Within this context, Plaintiff avers, the allegations that four officers noticed that Brandao was under the influence of an intoxicating substance, yet did not ensure he received medical attention, and the failure of Officer Louis to complete the required well-being checks, support the contention that the City of Brockton is liable under Monell. [Id.].

Plaintiff fails to state a claim under Monell. First, the Complaint says nothing about a Brockton police department policy or custom concerning searching or seeking medical attention for arrestees who appear intoxicated, and whether and how officers are trained on any such policy. See generally [Compl.]. Moreover, with respect to the policy requiring that officers check on prisoners every fifteen minutes, the allegations here are not that the policy of checking inmates every fifteen minutes is improper, that Brockton Police officers are not properly trained on that policy, or that untrained Brockton police officers repeatedly failed to uphold the policy, see Gray, 917 F. 3d at 14, but rather that a single officer failed to complete the checks as required. [Compl. ¶¶ 27–39, 85–86]. Accordingly, Plaintiffs have not sufficiently pleaded that any violation occurred pursuant to an official policy or custom. See Young, 404 F.3d at 26.

Thus, although Plaintiff alleges that the officers were not provided with "reasonable and adequate training and supervision with respect to the opioid epidemic crisis," [Compl. ¶ 105],

15

they have failed to allege a "pattern of similar constitutional violations by untrained employees . . . to demonstrate deliberate indifference," Connick, 563 U.S. at 62. Accordingly, Plaintiffs have failed to state a claim under Monell, and the motion to dismiss Count III is granted without prejudice.

## IV. CONCLUSION

Accordingly, for the reasons set forth above, the motion to substitute, [ECF No. 17], is GRANTED, and the motion to dismiss, [ECF No. 10], is DENIED as to Count I and GRANTED without prejudice as to Count III.

**SO ORDERED.**

May 1, 2024

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE